ADAM GORDON
United States Attorney
E. CHRISTOPHER BEELER
Assistant United States Attorney
California Bar No.: 330496
New York Bar No.: 5422068
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7748
Email: christopher.beeler@usdoj.gov

Attorneys for the United States

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SEAN WINSTON,<br><br>Defendant. | Case No.: 23-CR-2441-RSH<br><br>**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM**<br><br>Date: May 2, 2025<br>Time: 9:00 a.m. |

## INTRODUCTION

Present before this Court is a 45-year-old Defendant who used his shell company to fraudulently obtain $875,000 from two COVID-19 relief programs. He used the stolen money to obtain a fleet of luxury vehicles. This conduct warrants a custodial sentence, but considering Defendant's swift acceptance of responsibility and other important factors, the United States asks this Court to impose a 12-month custodial sentence.

## STATEMENT OF FACTS

**I.   The Relevant COVID-19 Relief Programs**

    **a. The Paycheck Protection Program**

Enacted to provide emergency assistance to businesses affected by the coronavirus pandemic, on March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) became law. See Public Law No. 116-136; 15 U.S.C. § 636(a)(36). Section

1102 of the CARES Act created the Paycheck Protection Program (PPP), which permitted the U.S. Small Business Administration (SBA) to guarantee 100 percent of qualified loans to small businesses. Under the law and its implementing regulations, small businesses could use PPP loans to pay salaries and wages, business rent, utilities, and interest on pre-COVID-19 debts. If a business used a PPP loan on such qualified expenses, Section 1106(b) of the CARES Act allowed forgiveness of the loan amount.

On December 27, 2020, the Economic Aid to Hard-Hit Small Business, Nonprofits and Venues Act (Economic Aid Act) became law. See Pub. Law No. 116-260. Among other things, the Economic Aid Act reauthorized another round of PPP loans, known as "Second Draw" PPP loans to eligible small businesses that previously received a first draw PPP loan under generally the same terms and conditions as the initial round of PPP loans. Section 311 of the Economic Aid Act explained that one additional eligibility requirement of a Second Draw PPP loan was that a borrower had to "demonstrate not less than a 25 percent reduction from the gross receipts" between 2019 and 2020. *See generally* 15 U.S.C. § 636(a)(37).

To obtain a PPP disbursement, applicants typically had to provide documents to show the existence of a payroll and, for Second Draw PPP, documents to show the 25% reduction in gross receipts. Acceptable documents typically included payroll lists, Forms 941 (Employer's Quarterly Federal Tax Return), bank statements, and profit and loss statements. Applicants self-certified under penalty of perjury that all the information provided was accurate.

**b. Economic Injury Disaster Loans**

Prior to and during the COVID-19 pandemic, the SBA offered Economic Injury Disaster Loans (EIDL) to small businesses impacted by a disaster. *See* 15 U.S.C. § 636(b)(2). Such disasters include hurricanes, tornadoes, wildfires, and any "major disaster" as determined by the President. *Id.* The SBA extended EIDL loans to small businesses impacted by the COVID-19 pandemic.

To obtain an EIDL loan, a qualifying business was required to apply directly to the SBA and provide information about the business's operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and the cost of goods sold in the 12-month period preceding the disaster. In the case of a COVID-19 EIDL loan, the 12-month period was from January 31, 2019, to January 31, 2020. The applicant was required to certify that all of the information in the application was true and correct. The amount of the loan, if the application was approved, was determined based, in part, on information provided by the applicant about employment, revenue, and costs of goods sold. Any funds issued under an EIDL loan were issued directly by the United States Treasury.

EIDL proceeds could only be used to pay fixed debts, payroll, accounts payable and other bills that could have been paid had the disaster not occurred; however, such loan proceeds were not intended to replace lost sales or profits, or expansion of the business. Nor were EIDL proceeds to be used to repay debts incurred prior to the pandemic. Moreover, in order to obtain EIDL monies, the prospective borrower was required to sign a Loan Authorization and Agreement, certifying his or her willingness to comply with all of the terms and conditions of the loan, including certifying that he or she would use all proceeds of the loan solely as working capital to alleviate economic injury to the business caused by the COVID-19 pandemic.

**II.   Defendant's COVID-19 Pandemic Loan Fraud**

Mr. Winston was the owner and chief executive officer of Atlas Capital Management, LLC (Atlas Capital), a California corporation. Atlas Capital was a company in search of work; it had no employees, made and sold no goods, provided no services, and generated no revenue. Instead, Atlas Capital was a front company through which Mr. Winston committed various acts of fraud. One such fraudulent endeavor consists of the crimes for which Mr. Winston has pleaded guilty: five counts of wire fraud for his unlawful acquisition and use of $875,900 from COVID-19 pandemic relief programs.

Between May 2020 and April 2022 and on behalf of Atlas Capital, Mr. Winston applied for and sought forgiveness of two PPP loans and one EIDL  To obtain these loans,

Mr. Winston submitted fake employee lists with false payroll data, phony bank records, and bogus business federal tax returns. Not only did these fabrications render Mr. Winston's applications materially false, he also misappropriated all of the fraudulently obtained funds.

Specifically, all COVID-19 pandemic loan proceeds were deposited into Atlas Capital's bank account at Comerica Bank. The bank account records fail to show any business expenses such as payroll, operational expenses, or other costs a business might incur. Instead, Atlas Capital's bank records confirm that Mr. Winston used the business account—and the COVID-19 pandemic relief funds—exclusively on personal expenses such as rent payments for his house, groceries, furniture, purchases from Internet retailers, and on the purchase or lease of the following luxury cars:

- A 2021 Cadillac Escalade;
- A 2020 Chevrolet Corvette;
- A 2018 Rolls-Royce Dawn;
- A 2022 Mercedes Benz S580; and
- A 2021 Lamborghini Urus.

In late September 2023, federal law enforcement executed a series of seizure warrants and seized these five luxury vehicles and all funds in two Atlas Capital bank accounts. The vehicles have either been administratively forfeited or, in the case where Mr. Winston had leased the car, returned to the bona fide owner.

## ARGUMENT

### I. Guidelines Calculation

#### A. Base Offense Level

The parties agree that the court should start its calculation of the Base Offense Level for wire fraud using U.S. Sentencing Guideline (USSG) Section 2B1.1(a)(1)[1] because the USSG references wire fraud to this section and the charge carries a maximum 20 year or more term of imprisonment. The Base Offense Level is **7**.

---

[1] All USSG references are cited to amendments effective November 1, 2024.

B. <u>Specific Offense Characteristics</u>

The court should add the following points to Defendant's Base Offense Level.

    1. *Loss*

The parties agree that the loss caused by Defendant's fraud is the total amount he fraudulently obtained from and has not paid back to the SBA: $875,000. *See* ECF 8 at 4-5. This amount is the "actual loss" defined in the Guidelines. This loss results in a **14-point increase**. USSG § 2B1.1(b)(1)(I).

    2. *Sophisticated Means*

The parties also agree to an additional **2-point increase** for sophisticated means. USSG § 2B1.1(b)(10)(C). The Guidelines permit a two-level increase if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." *Id.* The application note explains that "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of the offense. . . . Conduct such as hiding assets or transactions, or both . . . indicates sophisticated means." *Id.* cmt. n.9

The Ninth Circuit has recognized "the enhancement properly applies to conduct less sophisticated than the list articulated in the application note." *United States v. Jennings*, 711 F.3d 1144, 1147 (9th Cir. 2013). In *Jennings*, the defendants "syphoned money" from their business into another bank account they gave a legitimate appearing name to, and then the defendants used the money for personal purposes without reporting the money as income. *Id.* at 1145-47. The Ninth Circuit held this conduct justified application of the sophisticated means enhancement. *Id.* at 1147.

To render Atlas Capital eligible for COVID relief funds, Mr. Winston created and used a variety of fictional documents. These include various fabricated payroll records listing fake employees by name and salary, six months of bank account statements for the third quarter of 2019 and 2020 for an account Mr. Winston did not open until 2021, and a false business tax return on Form 1120-S for tax year 2020. These overlapping false documents show a level of sophistication Mr. Winston utilized to create the fiction that

Atlas Capital was (1) a functioning and thriving business and (2) eligible to receive vast sums of money from COVID-19 relief programs.

### C. Adjustments

#### 1. *Acceptance of Responsibility*

In its Sentencing Summary Chart, the United States has moved this Court for a **three-level decrease** for Mr. Winston's acceptance of responsibility under Guideline Section 3E1.1. Almost immediately following the seizure of his assets, Mr. Winston admitted to his felonious conduct in various proffer sessions with the government, waived indictment, and signed a plea agreement on November 1, 2023.

#### 2. *Zero-Point Offender*

Mr. Winston qualifies for a **two-level decrease** for not having a criminal history and otherwise qualifying for this adjustment under Guideline Section 4C1.1.

## II. Sentencing Factors

Pursuant to the Sentencing Reform Act, 18 U.S.C. § 3553, the Court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" Section 3553(a)(2), and, in so doing, the Court "shall consider," various factors enumerated in Section 3553(a). Given the nature of Defendant's crimes, the factors of particular importance in this case are the history and characteristics of Defendant, the need to promote deterrence, and the avoidance of sentencing disparities. A sentence of 12 months is sufficient, but not greater than necessary, to comply with the sentencing guidelines. This term sentence reflects the seriousness of Defendant's lying, stealing, and cheating for his own financial gain.

### A. Nature and Circumstances of the Offense

Defendant's plea agreement outlines an extensive scheme to defraud the United States by stealing emergency funds intended to provide a lifeline for struggling businesses during an unprecedented global pandemic that caused people to die and businesses to shutter for good. His actions were far from a momentary lapse of judgment or a one-time mistake: over the course of nearly two years, Defendant submitted five false COVID-19

relief applications that included fabricated business documents like fake payroll and employees lists, fake bank account statements, and fake federal tax returns.

With the money stolen, Mr. Winston made no attempt to spend the money on eligible business expenses. Instead, he misappropriated every nickel from these important relief programs, including on the acquisition of a small fleet of luxury cars like a 2018 Rolls Royce and 2021 Lamborghini.

### B. Personal History and Characteristics

Defendant is a 45-year-old family man. He has four young children with his wife of over twenty years. *See* Presentence Investigation Report (PSR) ¶ 53, ECF 15. As gleaned from meetings with Defendant and through conversations with defense counsel, Defendant is an engaged and loving father to these these young children. He did not graduate high school, but appears intelligent, hardworking, and entrepreneurial. Should Defendant apply his enterprising nature and work ethic to honest services, the sky is his limit.

### C. Deterrence

In addition to the need for specific deterrence, the need for general deterrence warrants a meaningful sentence. The COVID-19 emergency was not the first and will not be the last time the government relies on self-reporting to get much needed assistance to the public. Put simply, there needs to be a real risk of incarceration to weigh against the opportunity to enrich oneself. *See United States v. Martin,* 455 F.3d 1227, 1240 (11th Cir. 2006) (finding that crimes that are "rational, cool, and calculated" rather than "crimes of passion or opportunity" are "prime candidates for general deterrence") (citation omitted).

### D. Sentencing Disparities

The imposed sentences for COVID-19 relief fraud vary widely in the federal district courts because each court considers the nature of the fraud itself and the individualized defendant. While a 12-month sentence for stealing $875,000 may seem low to some people, this Court is aware of some unique circumstances present in this case that are likely not present in other similarly situated COVID-19 relief fraud schemes. Those unique aspects justify a 12-month sentence.

## **CONCLUSION**

Defendant is appearing to be sentenced for an illegal scheme to steal $875,000 during a global pandemic. His theft for personal benefit is countervailed by his rapid admission of guilt and usefulness on other matters. For the reasons provided, this Court should sentence Defendant to 12-months custody.

DATED: April 25, 2025               Respectfully submitted,

                                    ADAM GORDON
                                    United States Attorney

                                    /s/ *E. Christopher Beeler*
                                    E. CHRISTOPHER BEELER
                                    Assistant United States Attorney